[L. A. No. 4726.   Department Two.—May 21, 1917.]

## In the Matter of the Estate of MILTON L. WILLITS, Deceased.

Will — Mental Incompetency — Undue Influence — Verdict—Evidence.—A verdict of the jury, finding that the testator, at the time of the execution of the will in question, was not of sound and disposing mind, and that the will was the result of undue influence exercised by the residuary legatee, is held to be supported by the evidence.

Id.—Instructions—Burden of Proof.—The court properly instructed the jury that on the contest of the will the burden of proof was on the contestants to establish the allegations of incompetency and undue influence.

Id.—Unsoundness of Mind—Relation of Testator to Children and Property.—Under the evidence, the court properly instructed the jury that if the testator was of unsound mind, either as to the nature and extent of his property, or as to his relation to his children and the nature of their claims to his bounty, he could not be regarded as of sound mind and memory, though he may have been of sound mind as to all other persons and matters.

APPEAL from a decree of the Superior Court of Los Angeles County denying probate of a will, and from an order refusing a new trial.   Louis W. Myers, Judge.

The facts are stated in the opinion of the court.

Earl Rogers, W. H. Dehm, and M. M. Cohen, for Appellant.

Kemp, Mitchell & Silberberg, and Enyeart & Holton, for Respondents.

HENSHAW, J.—Milton L. Willits died testate on January 6, 1915. At the time of his death he was eighty-eight years and two months of age. The will was executed about eleven weeks before his death, and thus about three weeks before his eighty-eighth birthday. He left surviving him five adult children. By his will each of these children was bequeathed a legacy. To one was given one thousand five hundred dollars, to another one thousand dollars, to two others five hundred dollars each, and to the fifth the cancellation of a debt owed to the father. He gave also to two grandchildren five

hundred dollars each.   He then bequeathed to Bertha Helmer one thousand dollars, and all the rest and residue of his estate of every kind and character to her sister, Emma Helmer.   By this will the specific legacies amounted to five thousand five hundred dollars.   The total value of his estate at the time of his death is shown to be two thousand five hundred  dollars. This will was offered for probate.   Two of the sons contested and as grounds of contest pleaded, first, that the testator was not of sound and disposing mind at the time of the execution of the will, and, second, that the will was the  product of undue influence exercised upon the testator by Emma Helmer.

In this contest the jury found for the contestants upon both of the grounds advanced.   From the decree denying the will probate and from the order refusing to grant her motion for a new trial Emma Helmer appeals, and on appeal and as the principal ground for the reversal of the decree and order insists that the evidence is insufficient to sustain the verdict of the jury.

In view of the fact that the value of the testator's estate disposable under his will is but two thousand five hundred dollars, and that the specific legacies  amount in value to five thousand five. hundred dollars, it is at once apparent that Emma Helmer, the residuary legatee and  devisee, will take nothing under the will.   Her appeal, however, will be understood when it is explained that in the three years immediately preceding his death, during which  time the deceased was in intimate association with Emma Helmer, he gave to her and she received from him real and personal property of a value in excess of eighty-five thousand dollars, which property was all of the property which the old man owned, so that at the time of his death nothing remained but a small amount of personal property, livestock, and farming implements upon a valuable farm in Illinois, which farm he had  previously deeded to her.   Of everything but this personal property he had stripped himself or been stripped.   Moreover, of his five adult children, some were married and with children of their own.   None of them was in affluent circumstances—several of them quite poor.   Some of them had lived upon and faithfully worked the  father's  farm in  Illinois.   The. meager legacies—the face value of which they could not receive—were all that was left to them, while this stranger in blood, who had known him casually for but one or two years and inti-

mately for the three years preceding his death, took or was given all that the old man had. Actions are pending against Emma Helmer, instituted by the heirs at law of the deceased, for an accounting of his moneys, which in large sums came into her possession during his lifetime, and which she contends were gifts from him, and to set aside conveyances of real property which he made to her. Manifestly, if the heirs at law should be successful in these actions, the property thus recovered would become the residuum of his estate and fall under the residual clause of his will, by which Emma Helmer would take it all. Hence, while taking nothing under the will as it now stands, her contingent interest is very large, and hence, therefore, her appeal from the decree denying it probate.

As the principal proposition advanced upon appeal is the insufficiency of the evidence, a *résumé* of that evidence becomes necessary. Milton L. Willits, born in 1826, early in his lifetime married, became a farmer in Illinois, and by thrift and industry acquired large and valuable holdings of farm land. His wife bore him ten children, five of whom survived her and are still living. She died in 1869, and he became interested in spiritualism. This study or pursuit obsessed him. He endeavored to make a medium of his second wife, and the family friction which resulted led to proceedings instituted in the courts of Illinois to have him declared incompetent. In this his second wife and some of his children joined. The verdict of the jury favored him. His children grew up without any serious estrangement, apparently, resulting from this. His second wife was divorced and died and his interest in spiritualism waxed. In his own home he had "circles" about three times a week, attended other "circles" away from home, and had a "cabinet" for spiritualistic purposes built in his house. He firmly believed not only that he held through mediums direct communication with spirits in the other world, but that these spirits could take to themselves matter and so "materialize"; that through their direct aid and instrumentality one received messages, directions as to the conduct and the management of one's worldly affairs, artistic development in "picture making," in medicine and healing. He had for "guides" a band of spirits who were active in various branches for which they were best fitted. The personnel of this band changed from time to time.

Some were the spirits of people that he had known on this earth; others he had never known. Thus Dr. Dent, a former friend, was the head of the band that exercised healing powers. Maude Adams, the actress, was to him "Little Maudie," and was one of his spiritual guides. He knew that she had been a famous actress, but he knew also that she had "passed over" because she told him so. When it was established to him that "Little Maudie" was alive and still devoting her histrionic genius to the delight of audiences here on earth, he satisfactorily explained that sometimes evil spirits did this sort of false impersonation. The same is true of a "medium," Mrs. Karcher, into whose hands he fell. Mrs. Karcher was just on the point of perfecting herself by self-abnegation and study so that she could transmute dross into gold and silver ores of great value. More than this, she could, when she had attained full power, "materialize" these valuable metals out of airy nothingness. Mrs. Karcher secured a written contract under which the deceased bound himself to maintain her during her period of study until she perfected herself, when out of the profits which would immediately follow she was to repay him. He became alarmed about Mrs. Karcher, declaring not unwisely, as his experience proved, "that he was afraid of women, they always had gotten my money." So he gave her one hundred dollars and fled. He was perturbed for fear Mrs. Karcher would seek him out and endeavor to enforce his contract, but was much relieved when her spirit appeared and told him she was dead. Being afterward advised that Mrs. Karcher was still upon this earth, he declared that there must be some mistake about it, as her spirit had certainly appeared to him.

Paying more attention to chronology, after the divorce from his second wife, Mr. Willits became interested in a medium who was a great "magnetic healer," and installed her with her husband and son on his farm, where they remained for over a year. In 1882 or 1883 there was laid out at Mt. Pleasant Park, at Clinton, Iowa, a spiritualistic camp-ground where were held annual meetings. Mr. Willits assisted in its organization, advanced money, joined as maker of a note to secure a loan for it, was a director, and attended every meeting from its organization until his death, except in the years 1912 and 1913. In this park he built two cottages which he rented during the meetings, himself living in one

of them.  About 1897 he came to this state under the direc-
tions of the spirits and became involved with the Karcher
woman, as above related.  Leaving California, he went to
Chicago, and from 1902 to 1907 spent the major portion of
his time with a Mrs. Green, who there resided.  Mrs. Green
was a medium, and seances were held at her house.  With
Mr. Willits' assistance she was developing a higher order of
spiritualism known as the "Magi."  The members of this
society of Magi called to their aid in their troubles over
mundane affairs the spirits of the ancient Atlantians, who
had their earthly residence upon the now submerged con-
tinent of Atlantis.  Mr. Willits' especial "guide" or "con-
trol" during the period was an Atlantian spirit called
"Billy."  These researches into higher spiritual truths and
demonstrations were rudely interrupted by the police of
Chicago, who broke into one of Mrs. Green's meetings and
after a fight arrested her.

After this experience, with faith unshaken, he continued to
attend the meetings at the spiritualistic camp.  He was con-
firmed in his devotion by a communication which he received
from Mr. Burdick, whom he had known on earth, and who
had "passed over," Mr. Burdick telling him that the five
thousand dollars which he had loaned to the Mt. Pleasant
Park was the best investment he (Mr. Burdick) had ever
made, the reason being, as Mr. Burdick's spirit explained,
that when he "passed over," because of this loan, the spirits
"in the other world had met him and taken good care of him
and fixed him up right."  Mr. Willits' own exposition upon
this subject was that the more you did for spiritualism in
this world the better off you were with the spirits in the
next world, and he instanced the case of a friend of his,
William Drury by name.  William Drury in his lifetime had
done nothing for spiritualism and when he "passed over" he
was left in "outer darkness"; the spirits did not receive him
very well and he did not get along with them, but being in-
formed of this he, Mr. Willits, got in communication with
them and fixed it up so that now "Mr. Drury was doing fairly
well."

Thus Mr. Willits' life flowed on, very much under the guid-
ance of the communications which he received from the spirit
world through the mediums whose society he frequented.  In
1908 he first met Emma Helmer at the spiritualistic camp, and

CLXXV Cal.—12

again in 1910. Their acquaintance up to this time was casual.
Emma Helmer's occupation was that of a stenographer. She
had spent several years in that capacity in a lawyer's office
in Denver, Colorado, and she had been a public stenographer.
She was interested in spiritualism. She addressed the camp-
meetings upon the wonders of spiritualism; she was active in
endeavoring to sell "scholarships," which entitled the holder
to take a course of study in spiritualism and for the sale of
which she received a commission. Knowing Mr. Willits but
casually, in 1910, after the camp-meeting, she sent him a
Christmas card. Later he wrote to her, asking her if she
would take care of the renting of his cottages in 1911, and
she agreed to do so. At the camp-meeting of 1911, which
both attended, they came into close personal relationship.
To a witness who was present at that camp-meeting, a Miss
Burton, Mr. Willits expressed the desire to find Mr. Green
(the husband of Mrs. Green, the medium above mentioned),
and to induce him to go with him to California. Emma
Helmer, being told of this by Miss Burton, asked Miss Burton
to "tell Mr. Willits that 'I will take him to California. That
is just where I want to go, but I can't go, unless I find some-
one to pay my traveling expenses.'" The result was that
when Mr. Willits left the camp-ground Emma Helmer went
with him. They traveled about together, going to New
Boston, in Illinois, where was Mr. Willits' farm; thence to
Colorado—Emma Helmer's home—thence back to New Bos-
ton; then to San Diego, California, and finally to Los Angeles,
where a home was bought and paid for with Mr. Willits'
money. They moved from this first home to another in Los
Angeles and there he lived with the Helmer family until
his death. He thus lived with the Helmers for the last three
years of his life, from the time when he was eighty-five years
of age until he was eighty-eight years of age. During their
travels of course Mr. Willits paid all expenses. Within two
months after they were settled in Los Angeles Miss Helmer
received from him one thousand dollars. Within three
months she had received over four thousand dollars. In a
period of seven months she was the recipient of $12,670. In
the year 1913 she obtained over four thousand dollars. In
1914 she obtained over three thousand dollars. This was
all of the money which he had accumulated in the past years,
and in addition to this she received the major portion of the

money which he received from the sale of a part of his farm land—all of it, indeed, save that which went for the payment of his obligations.  Before this friendship sprang up his monthly expenditures had not exceeded one hundred dollars. Afterward he not only withdrew and turned over to Emma Helmer all the moneys which he had accumulated and all that came in as proceeds from his farm, but he was constantly importuning his banker in Illinois to send on every deposit made to his credit as promptly as possible.  Every one of these deposits was turned over to Miss Helmer.  In these years he was physically feeble, his personal expenditures negligible, for he seldom or never left the Helmer home excepting in the company of Emma Helmer.  He wrote a number of letters quite by himself.  Later his correspondence was taken over by Emma Helmer and his letters were typewritten by this competent stenographer.

In 1914 Emma Helmer and her mother accompanied or took the old man to the Iowa spiritualistic camp-meeting.  She carried the purse and attended to all the details of travel.  Their relationship was such that at the camp-meeting Mr. Bloomer, a friend of Mr. Willits, complimented him on his "fine-looking wife."  Miss Helmer replied, "We are not married.  I am keeping house for him.  God sent me to take care of him." They made this eastern trip in the late summer or early autumn of 1914, but in the middle of April preceding Mr. Willits executed to Emma Helmer his deed of all of his Illinois lands. The deed was prepared by Miss Helmer herself.  The form appropriate for such a conveyance under the laws of the state of Illinois, and the description of the property, being obtained from Mr. Willits' papers and the deed itself typewritten by Miss Helmer.  After the deed was so drawn by Miss Helmer in her home she escorted the old man to a notary public, where he executed it and gave it to her.  She did not have it recorded until after his death, and indeed maintained the utmost secrecy about it, even under circumstances, as will hereinafter appear, where a disclosure was manifestly called for. While at the camp-meeting in Clinton, Iowa, in like manner the deceased conveyed to her the two cottages which he owned. This conveyance she had placed of record, and it is not without significance that the deed to the Iowa property, which in all probability would not come under the notice of the deceased's relatives, was recorded, while the utmost reserve was

maintained in the matter of the deed to the farm in Illinois, where Mr. Willits' children resided. Leaving the camp-meeting, the three—Mrs. Helmer, Miss Helmer, and Mr. Willits—went to New Boston, near to which town his farm was situated. They saw none of Mr. Willits' children, and it is doubtful whether those children were advised of their father's presence. This last visit to New Boston was made after Mr. Willits had conveyed to Miss Helmer all of his real property. Notwithstanding this, he gave a written option while at New Boston agreeing to sell his ranch for $150 an acre, except eighty acres of rough land, which was to be sold at one hundred dollars an acre, and agreeing further to pay one dollar per acre commission upon such sale. Miss Helmer explains this act of Mr. Willits as being his endeavor "to get a price on the land," but it is not a strained inference to conclude that he thought that he was giving an option for the sale of real property which was his own.

While they were thus at New Boston, and on the eve of their departure for California, they were served with summons in conservator or guardianship proceedings instituted by one or more of the children. Mr. Willits became much excited, but Miss Helmer quieted him, telling him to keep cool, that "she would see him through; that she had not been in a law office four years for nothing." Mr. Willits was on the verge of a collapse. Mr. Campbell, a disinterested witness, testified that Miss Helmer declared that these proceedings "were a disgrace that the children had brought upon Grandpa that she was not going to stand for, but she would spend her own money if necessary in order to defend his good name." Mr. Campbell explained that senility was not a reflection upon his good name, but was a mere matter of physical and mental decadence, and that the action was quite natural, because he knew that in his "normal mind he [Mr. Willits] would desire his property to go to his children." He also told Miss Helmer, who solicited him to bear testimony to Mr. Willits' competency, that he could not take the witness-stand and say that he considered Mr. Willits capable of handling his own affairs, and referred to the control exercised in those affairs by the spirits. Miss Helmer "said that was a matter of religious belief and ought not to enter into business affairs. But I pointed out to her in what manner that might easily influence the disposition of a man's property."

All this resulted in Miss Helmer seeking the services of Mr. Hanna, an attorney at law in the near-by town of Monmouth. In the conversations and consultations over the matter of the conservator proceedings, at all of which Miss Helmer was present, she made no disclosure to Mr. Hanna of the fact that Mr. Willits had given to her substantially all that he possessed. The conversations assumed that Mr. Willits was still a prosperous, prudent farmer, whose children were endeavoring to take his "property" away from him. Miss Helmer is particular to say that they were endeavoring to take his "property" and not his "farm," Mr. Willits' property at that time, under Miss Helmer's contention, being wholly and exclusively the small amount of personalty left on her farm. Notwithstanding the fact that one of the specific charges in the conservator proceedings was that he was squandering and dissipating his estate, she made no disclosure to Mr. Hanna of what in fact Mr. Willits had done for and given to her.

It was there and at that time and under these conditions that the will here questioned was drawn and executed in the office of Mr. Hanna. The circumstances leading up to the making of the will are narrated by Mr. Hanna and Miss Helmer. They are somewhat vague, but it does appear that Mr. Hanna, the attorney for Mr. Willits only in the conservator proceedings, asked Miss Helmer if Mr. Willits had made his will, and when it was found that he had not, he was advised to do so. The conversations were for the most part in the presence of Mr. Hanna, Miss Helmer, and her mother, though Mr. Hanna conversed with Mr. Willits alone. As a result of his conversation with Mr. Willits, and without suggestion from anyone else, the will was drawn in accordance with Mr. Willits' expressed wishes. Mr. Hanna dictated the terms of the will, Mr. Willits came back in the afternoon of the same day the will had been prepared, it was read to him, and its legal effect explained. No one was present when it was read and explained to him, and Miss Helmer was not present when it was executed. Immediately thereafter Mr. Hanna secured the presence of Mr. McCray and Mr. Martin, two business men of the town and wholly disinterested, and they witnessed the execution of the will. Such is Mr. Hanna's version, given by deposition.

Notwithstanding this testimony, the two disinterested witnesses to the execution of the will declared that there was a

lady in the room at the time Mr. Willits executed the will in their presence, that it was not a stenographer in Mr. Hanna's office, as Mr. Hanna endeavored to make it appear, but it was a young woman in street clothes, whose name they believed was Helmer, and, as their recollection served, she had her hat on. Of significance in this connection is the varied evidence given by Miss Helmer herself. Upon the witness-stand Miss Helmer testified positively that she was not present at the time the will was made; that she went to Mr. Hanna's office in the afternoon to take Mr. Willits away with her; that she did not hear the reading of a will to Mr. Willits and did not see the witnesses who signed the will as witnesses; she did not hear the will read nor any of its provisions and did not know of the execution of the will until afterward, when Mr. Willits told her he had a will drawn and gave it into her charge. Miss Helmer first gave her deposition concerning these matters. This deposition was transcribed and submitted to her for correction. She retained it in her possession for some weeks. During this time the deposition of Mr. Hanna was taken in Illinois, and Mr. Hanna, it will be remembered, testified that Miss Helmer was not present at the reading of the will to Mr. Willits or at its execution. The following excerpts from Miss Helmer's testimony are illuminating. The answers which are canceled are those answers which appeared in the original transcription of her deposition. The amended answers were given under the indicated circumstances, the emendations being underscored. Asked how she obtained possession of the will, her answer is:

"Mr. ~~Hanna~~ Willits gave it to me to take, and I returned it to Mr. Hanna afterward."

Asked when she first saw the will in Mr. Willit's possession, she answered "Back there ~~in~~ after we left Mr Hanna's office.".

Her deposition then proceeds as follows

"Q Do you remember the fact that Mr Martin and Mr. McCray were called in from another office to witness the will?

A. ~~I think they were."~~ I don't know anything about it.

Q. During the time you were there was this will signed?

A. ~~Probably.~~ I don't know

Q. Don't you know that was the fact?

A. ~~I guess that was so.~~ I don't know that it was.

Q. Did you hear the will read at that time?

A. No sir.

Q. Did you hear any of the provisions of it?

A. Just a little.

A. Yes sir.

Q. You heard all of that read to Mr. Willits by Mr. Hanna?

A. No ~~Yes~~ sir.

Q. You were near enough so that you could hear the reading of that will?

A. Yes sir. I heard the reading of ~~that will.~~ of a little of it.

Q. And then Mr. Willits signed it?

A. I don't know when he signed it. ~~Yes sir; I think he signed it then.~~

Q. And then he called out the two witnesses and signed it before them?

A. No sir; I do not know when the witnesses were called in. ~~they called them in before.~~

Q. And he signed it in the presence of the witnesses?

A. He evidently did. ~~Yes sir; in the presence of the witnesses.~~

Q. After this was all read over, what did Mr. Willits say?

A. I don't know what he said, I was not there. ~~He didn't say anything.~~

Q. He didn t say, 'That is all right'?

A. How can I tell when I was not there. ~~He didn't say anything—I suppose that is so—he said, 'That is all right.'~~

Q. Did he say anything?

A. Mr. Hanna could tell you. ~~I think that is what he said.~~

Q. Isn't it a matter of fact that he did not know what was being talked about?

A. I don't believe Mr. Willits ever signed anything he didn't understand. ~~Of course he knew what it was. He made it himself. He ought to know it was all right.~~

Q. Didn't he say to Mr. Hanna, 'That is all right  That is the way I want it?

A. I do not know what he said. ~~I think he did say it.~~

Q. As a matter of fact, Mr. Willits was so deaf that he couldn't hear?

A. He could hear when spoken to distinctly. ~~Yes sir.~~

Q. He read it so loud that you and everybody else could hear?

A. Yes sir.

Q. Were the witnesses present when the will was being read over to Mr. Willits?

A. I suppose so. ~~Yes sir.~~

Q. And they discussed the contents of the will with Mr. Willits?

Maybe they did.
A. ~~They talked to him and had a conversation with him.~~
Q. What did he say?
     know what they said.
A. I don't ~~remember.~~
Q. Didn't he tell you that people could come back?
     under certain conditions.
A. He believed that they could communicate. ∧
Q. And appear to them?
A. Yes sir.
     ( he might have thought this possible."

· The argument of appellant is that Mr. Willits, notwithstanding his age, was a shrewd, prudent business man of cultivated mind; that he was a student of spiritualism, no more; and that his spiritualistic theories were not permitted by him to influence him in the conduct of his daily life and business affairs. The evidence upon these matters, besides that of disinterested witnesses, is abundant from the writings of the deceased himself. Touching his cultivation and spiritualistic beliefs the following are extracts from a letter written by him in 1912 to a comparative stranger, who he apparently thinks is related to him. He writes to him something of his genealogy, explaining that, "On my mother's side of the family they wer what wer called Pensylvaney Duch both family were Quakers so we belong to that sock my father & mother died with what was called milk sickness one dieng one day and the other the next." He then proceeds: "I spent the most of the last ten years in the city of Chicago Ill in the family by the name of Green the wife of Mr. Green is what is known as a materializing medium. This somewhat strange process consists in reclothing the spiritual body in a real material body as it seams in the mortal body this is accomplsid by by the help of the of a band of kemests on the spirit side of life who are able to draw the nessarry elements from the meduom & the sitters in the circle to reclothe the spiritual form my own experience has proved to me beond a posable doubt that this is a truth. How do I know this to bee true because I had had actual communication with many people that I was well acquainted with they lived in the life form also those that I never knew on earth spirit communion I think is the grandest thing that came to earth without it we could get no evidence of a futur life all Bibles all evidence of a future life would bee imposable By what natrar is this wonderful blessing secured by the messmerick or psychic law

of controle which enables one person to controle the physical body of another person I have been given the proscess by which this is obtained is to depolarize the brain cells that is to throw the celles into a negative condition this anables the spirite or operator to express itselfe the same that it does or can through its own organism you know it is n uncoman thing for people to be paralozed and loose controle of part of their physical bodies and sometimes the hole physical structure.'' In 1907 the husband of one of his daughters had died. His name was Hollis. He writes to his daughter that he has heard from Hollis in the spirit world, and tells her: ''Bro H H Roberts & his Sone Earnest wer hear the Son to get help Hollis brought for the same purpose here they meet their Friends this gives the Spirite a better opportunity to gain strength and light I was toled that Hollis & Earnest were about in the same Condition.'' Hollis and his wife owed Mr. Willits money in his lifetime. When Hollis died he left his wife in poverty. The father enforced from his widowed daughter the collection of this debt upon the ground that Hollis in the spirit world had directed him so to do, and he writes to her: ''Well that was Fortunate inDeed for if I had not been here and so situated that I could arrange matters with Hollis agreeable to his wishes to have the Debt payed off theire could have been nothing done to settle the Debts satisfactorily so I feel sure evry thing has turned out for the best.'' It will be remembered that he sold eighty acres of his land for fourteen thousand dollars. That was in 1912 and while he was living with Miss Helmer. By far the greater portion of this money went to Miss Helmer. A disinterested witness testified that Mr. Willits told him that ''he had got orders to sell that land. He said he had been told to sell it and his business here was to sell it. He said he had a communication from the spirit world.'' Touching his mental condition during the last portion of his life, his mind was feeble, his memory bad, and he either did not understand or took no interest in anything saving spiritualism. ''He told me many times that that was one of the greatest things that he could do. Every dollar that he spent in developing mediums and assisting the spirits to manifest would be a great source of pleasure to him in the future life.''

It would be a serious reflection upon the intelligence of the profession if space should be given to a discussion of the suffi-

ciency or insufficiency of this evidence to support the verdict. It speaks so positively and convincingly as to require no comment, and we pass on, therefore, to the asserted errors in the matter of the instructions which the court gave and refused to give to the jury. The first complaint is that the court refused to instruct the jury that the burden of proof was on contestant to establish the allegations of incompetency and undue influence. Yet throughout its instructions the court with much repetition did so instruct the jury. Thus it told the jury, "One has the right to make an unjust will, an unreasonable will, or even a cruel will. He may make an unjust, an unnatural or capricious will. Unless you believe the contestants have proven their case by a preponderance of the evidence you must find for the proponent." Again, after telling the jury that the presumption of law was that the testator was of sound and disposing mind on the date on which the will was made, the court added, "Likewise in this connection the burden of proving the contrary by a preponderance of the evidence rests upon the contestants."

The court instructed the jury as follows: "You are instructed that if M. L. Willits was of unsound mind, either as to the nature and extent of his property, or as to his relation to his children and the nature of their claims to his bounty, he cannot be regarded as of sound mind and memory, though he may have been of sound mind as to all other persons and matters."

The objection to this instruction does not appear to be that it contains any erroneous declaration of law, but only that there was no evidence in the case to which it was applicable, appellant declaring that "there is an abundance of evidence in the case presented by the contestants themselves showing that the decedent at all times was perfectly competent to understand the treatment accorded him by his children in contrast with that of strangers who took care of him, and that he had full understanding of the status of his property."

The foregoing summarization of the evidence, imperfect as it is, is a complete answer to this objection.

Having thus considered all of the propositions advanced by appellant, it follows that the judgment and order appealed from should be affirmed and it is so ordered.

Melvin, J., and Lorigan, J., concurred.